## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

Jasen Bruzek, Hope Koplin, and Neil Miller,  Case No. 18-cv-697
individually and on behalf of all others
similarly situated,

    Plaintiffs,

  v.

Husky Energy Inc. and Superior Refining
Company LLC,

    Defendants.    (Jury Trial Demanded)

## CLASS ACTION COMPLAINT

Plaintiffs Jasen Bruzek, Hope Koplin, and Neil Miller, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendants Husky Energy Inc. and Superior Refining Company LLC. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

### INTRODUCTION

1. On April 26, 2018, the Superior Refining Company LLC refinery in Superior, Wisconsin ("Husky Superior Refinery") exploded.

2. Debris from the explosion flew about 200 feet and punctured a large aboveground storage tank containing asphalt. More than 15,000 barrels of hot asphalt spilled into the refinery. The asphalt ignited about two hours later, creating a massive fire. The fire sent a thick, black plume of acrid smoke into the sky. The smoke plume and the risk that the fire would compromise

1

a tank of toxic hydrogen fluoride located 150 feet away forced the evacuation of the city of 27,000 residents.

3.     The U.S. Chemical Safety Board ("CSB") deployed immediately to the Husky Superior Refinery to begin determining the cause of the explosion. On August 2, 2018, the CSB issued a report revealing the suspected cause of the explosion—equipment failure. Specifically, Defendants were using a worn-out valve that failed to separate oxygen and hydrocarbons, allowing a flammable mixture to form.

4.     Plaintiffs Jasen Bruzek, Hope Koplin, and Neil Miller now bring this action to hold Defendants accountable for, among other things, their failure to exercise due care in operating the Husky Superior Refinery, leading to the refinery's explosion and forcing the evacuation of Plaintiffs and other residents from their homes, workplaces, and businesses.

## PARTIES

5.     Plaintiff Jasen Bruzek is an individual who resides in Superior, Wisconsin. On April 26, 2018, Bruzek and his family were forced to evacuate as a direct result of the Husky Superior Refinery explosion. Bruzek suffered damages including, but not limited to, economic loss from evacuation-related expenses, lost wages, disruption and inconvenience, and interference with property rights.

6.     Plaintiff Hope Koplin is an individual who resides in Superior, Wisconsin. On April 26, 2018, Koplin and her family were forced to evacuate as a direct result of the Husky Superior Refinery explosion. Koplin suffered damages including, but not limited to, economic loss from evacuation-related expenses, lost wages, disruption and inconvenience, and interference with property rights.

2

7.     Plaintiff Neil Miller is an individual who resides in Superior, Wisconsin. On April 26, 2018, Miller and his family were forced to evacuate as a direct result of the Husky Superior Refinery explosion. Miller suffered damages including, but not limited to, economic loss from evacuation-related expenses, disruption and inconvenience, and interference with property rights.

8.     Defendant Husky Energy Inc. is incorporated in Alberta, Canada, with its registered and principal office located at 707 - 8th Avenue S.W., Calgary, Alberta T2P 1H5, Canada. Husky Energy Inc. is an "integrated energy company," meaning it has its hands in everything from extracting crude oil to marketing refined products like gasoline and asphalt, with operations in Western and Atlantic Canada, the United States, and the Asia Pacific Region.

9.     On or around November 8, 2017, Husky Energy Inc. acquired the Husky Superior Refinery, located at 2407 Stinson Avenue, Superior, Wisconsin 54880, from Calumet Specialty Products Partners, L.P. for $435 million in cash.

10.     Defendant Superior Refining Company LLC is a Delaware corporation with its principal office in Dublin, Ohio. It is registered to do business in Wisconsin and has a registered agent, CT Corporation System, located at 301 S. Bedford St., Suite 1, Madison, WI 53703. Superior Refining Company LLC is the owner and operator of the Husky Superior Refinery and does business under the licensed and registered trade name "Husky Energy."

11.     Husky Energy Inc. and Superior Refining Company LLC are referred to collectively herein as "Husky Energy" or "Defendants."

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5 million, given that thousands of people were forced to evacuate; there are more than 100 putative class members;

the Plaintiffs and any putative class members are citizens of a state different from Defendant Superior Refining Company LLC; and the Plaintiffs and any putative class members are citizens of a state while Defendant Husky Energy Inc. is a citizen of a foreign state.

13.     This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in Wisconsin and this lawsuit arises out of Defendants' acts alleged herein which originated in this District. Additionally, Defendant Superior Refining Company LLC is registered to do business in Wisconsin.

14.     Venue is proper in this District because: (a) putative class members are residents and citizens of this District; (b) Defendants are subject to the Court's personal jurisdiction with respect to this action and are therefore considered residents of this District for venue purposes; and (c) pursuant to 28 U.S.C. § 1391(b), a substantial part of the events or omissions giving rise to the harm of the putative class members occurred in this District, and a substantial part of the property that is the subject of this action is situated in this District. Finally, to the extent Defendant Husky Energy Inc. is not considered a resident of this District, it may be sued in any judicial district, including this District, under 28 U.S.C. § 1391(c)(3).

## COMMON FACTUAL ALLEGATIONS

### I.    Background on the Husky Superior Refinery

15.     The Husky Superior Refinery was built in 1950. It is Wisconsin's sole refinery, providing gasoline, asphalt, and other specialty petroleum products. About 50,000 barrels of oil per day can be processed at the refinery. A project to increase the heavy oil processing capacity at the refinery was expected to be completed in the first half of 2018.

16.    Defendants use, handle, and store explosive, flammable, and hazardous substances at the Husky Superior Refinery. These substances include hydrogen fluoride, used as a catalyst for producing higher-octane gasoline.

17.    Hydrogen fluoride is extremely dangerous. It is a fast-acting acid that can cause severe burns or, with sufficient exposure, kill. Exposure can occur through inhalation and skin contact. The chemical can permanently damage the eyes, skin, nose, throat, respiratory system, and bones. If released, hydrogen fluoride can become airborne and form a toxic gas cloud.

18.    Fortunately, a safer alternative to hydrogen fluoride exists: sulfuric acid. Sulfuric acid poses less danger as it does not have the potential to become airborne if released.

19.    Superior Mayor Jim Paine and Duluth Mayor Emily Larson have called for Defendants to discontinue the use of hydrogen fluoride at the Husky Superior Refinery. Although converting from hydrogen fluoride to sulfuric acid would be costly, the potential of having a chemical cloud of hydrogen fluoride covering Superior would be catastrophic. The toxic cloud could travel 25 miles and put 180,000 people at risk of injury or death. That was the danger Plaintiffs and Class Members faced on April 26, 2018.

## II.    The Husky Superior Refinery Explosion and Fire

20.    On April 26, 2018, there was a series of explosions and a massive asphalt fire at the Husky Superior Refinery—one of the largest disasters the community has ever seen.

21.    The initial blast occurred shortly after 10:00 AM. A contractor working inside the refinery described it as a "big sonic boom." One Superior resident said "it felt like a bomb." And according to the Principal at Great Lakes Elementary, located a couple of miles from the refinery, "It sounded like something was shaking on top of the building."

22.     At the Husky Superior Refinery, debris from the explosion flew about 200 feet and punctured an aboveground, steel storage tank containing roughly 50,000 barrels of asphalt. Over 15,000 barrels of hot asphalt spilled out of the tank into the refinery.

23.     About two hours after the initial blast, around 12:15 PM, the spilled asphalt ignited and created a massive fire that spanned multiple units at the refinery. The high heat triggered a series of seven or eight more explosions that occurred around 12:40 PM.

24.     The fire raged within 150 feet of a tank of toxic hydrogen fluoride. A contractor at the Husky Superior Refinery said he was "emotional. I thought I was going to die."

25.     The fire burned for hours and sent up a plume of noxious, oily smoke. The National Weather Service reported that the smoke plume appeared as a storm cloud on radar and had reached beyond Solon Springs, about 30 miles southeast of the refinery. The fire burned so intensely that the Superior Fire Department Battalion Chief stated, "We can't get people close enough to actually put the fire out."

## III.    Mandatory Evacuation of the City of Superior

26.     The fire's proximity (150 feet) to a tank of hydrogen fluoride at the Husky Superior Refinery prompted the Douglas County Emergency Management to issue a mandatory evacuation order ("Evacuation Order") and declare a state of emergency.

27.     At a 3:00 PM press conference, Superior Mayor Jim Paine ordered the evacuation of everyone within a 3-mile radius of the Husky Superior Refinery. City and county officials also ordered the evacuation of everyone within 10 miles south of the fire, due to the potentially toxic nature of the spreading plume. This area under mandatory evacuation—which covered more than 70 square miles—is hereinafter referred to as the "Evacuation Zone."

28.     According to the Douglas County emergency management director: "We're evacuating because there's a tank of product [hydrogen fluoride] there that, if it ruptures, it could create a plume that could be hazardous to one's health. We've done some plume modeling with the wind and stuff. That's what was used to develop the evacuation zone that we have in place in the event that the tank [of hydrogen fluoride] ruptures."

29.     The map below shows the Evacuation Zone.



30.     Up to 180,000 people in the region surrounding Superior, Wisconsin could have been injured or killed had the fire and explosion compromised the tank of hydrogen fluoride at the Husky Superior Refinery, according to the Center for Public Integrity.

31.     Superior Mayor Jim Paine acknowledged that the fire had the potential to be "absolutely catastrophic." Indeed, an environmental consultant said the release of hydrogen fluoride would create a "dense, cold, killing cloud" that "can move for miles downwind."

32.     The next morning on Friday, April 27, 2018, Superior Mayor Jim Paine lifted the Evacuation Order, allowing residents to return to their homes.

**IV.     U.S. Chemical Safety Board Report**

33.     The U.S. Chemical Safety Board ("CSB"), an independent federal agency charged with investigating serious chemical incidents, arrived at the Husky Superior Refinery on the same day as the explosion. The CSB has been interviewing Husky Superior Refinery management and employees, reviewing documents, collecting photographic and other evidence, and analyzing the refinery to determine the cause of the explosion.

34.     On August 2, 2018, the CSB issued a report revealing the suspected cause of the explosion—equipment failure. Specifically, Defendants were using a worn-out valve that failed to separate oxygen and hydrocarbons, allowing a flammable mixture to form.

35.     The Husky Superior Refinery explosion occurred while Defendants were shutting down the refinery's Fluid Catalytic Cracking Unit ("FCCU") for maintenance. The CSB advises that start-ups and shut-downs are generally the most dangerous periods for refinery operations. A senior CSB advisor said, "There needs to be greater attention to detail because you're dealing with products and systems that work with different pressures and temperatures. Those, if they're not closely monitored, can create problems."

36.    The FCCU uses heat and a small particle-size, solid catalyst to convert high molecular weight hydrocarbons into more valuable, lower molecular weight hydrocarbons. In other words, the FCCU is part of the refining process which subjects crude oil to heat and pressure in order to extract gasoline and other petroleum products.

37.    The FCCU's refining process involves the controlled flow of material between its reactor and its regenerator. The reactor contains hydrocarbons, while the regenerator contains oxygen, or air.

38.    According to the CSB, "it is important to prevent air in the regenerator from mixing with hydrocarbons in the reactor and downstream equipment because of the potential for such mixing to create flammable (explosive) hazard conditions within portions of the FCCU." This is achieved, in part, by using slide valves to maintain a catalyst level in both the reactor and regenerator, acting as a barrier to prevent air from mixing with hydrocarbons.

39.    When the CSB disassembled and evaluated the Husky Superior Refinery's slide valves after the explosion, it discovered internal wear in at least one of the valves that could have allowed catalyst to flow through the valve even when the valve was in the closed position.

40.    Data processed by the CSB shows that catalyst did continue to flow through the slide valve after it was closed, with the catalyst level falling to zero within twenty minutes of the valve closing. A post-incident inspection confirmed that a catalyst level was not present above the slide valve. This had catastrophic implications given that the refinery's FCCU shutdown procedure specifies that catalyst is necessary for maintaining a seal across the slide valve.

41.    The CSB analyzed data from a differential pressure instrument, which continually measured the difference in pressure directly above the slide valve. A positive differential pressure indicates that no air was flowing from the regenerator into the reactor at that time. A

9

negative differential pressure indicates conditions which could allow air to flow into the reactor. The instrument recorded any negative differential pressures as zero.

42.    The differential pressure was measured at zero for approximately ten percent of the time period between the beginning of the shutdown at 5:40 AM and the explosion at 10:00 AM. This means that, for roughly 25 minutes, conditions existed which would allow air to flow from the regenerator into the reactor, allowing oxygen to blend with the hydrocarbons and create a flammable mixture.

43.    Worse, even during the time period when there was a positive differential pressure above the slide valve, the lack of a catalyst barrier meant that it was possible for hydrocarbons to flow into the regenerator, which would also create a flammable mixture.

44.    The CSB has deduced that, after the flammable mixture formed, it traveled downstream to another part of the unit, where it met with an ignition source and violently exploded.

**V.    History of Safety Issues at the Husky Superior Refinery**

45.    The Husky Superior Refinery explosion is just one of a long string of safety issues by Defendants and the refinery that has landed them in trouble with regulators.

46.    The Husky Superior Refinery has been cited for serious safety violations. In 2008, when Murphy Oil owned the refinery, it paid a fine of $179,100 to settle more than 30 federal safety violations. Then, in 2015, the Occupational Safety and Health Administration issued four citations to the Husky Superior Refinery, three of which were for serious violations involving flammable and combustible liquids, hazardous waste operations, and emergency response.

47.    The April 26, 2018 explosion at the Husky Superior Refinery was also not the first refinery explosion for Husky Energy Inc.

48.     On January 10, 2015, the Husky Energy Inc. refinery in Lima, Ohio exploded. At about 6:00 AM, a fire started that sent black smoke billowing above the refinery. The blast from the explosion blew out windows at approximately 20 homes in Lima and could be felt at least 10 miles away. The explosion launched shrapnel, large pieces of metal, and ash throughout the immediate area near the refinery. The fire was not contained until about 6:00 PM—twelve hours after the explosion.

49.     Fortunately, unlike the Husky Superior Refinery explosion, no one had to be evacuated because of the Lima refinery explosion.

50.     Despite the January explosion at the Lima refinery, Husky Energy Inc. continued operations and another fire broke out at the Lima refinery just eight months later on September 20, 2015. Then, in January 2018, a large fireball erupted from the Lima refinery, terrifying residents who were still wary after the past two fires.

## VI.   Significant Impact of the Explosion on the Superior Community

51.     At the company's annual meeting in Calgary, on the same day as the Husky Superior Refinery explosion, the Husky Energy Inc. CEO dismissed any connection of the explosion with safety issues, saying merely, "There was a fire and the fire is out."

52.     The fire and explosion at the Husky Superior Refinery, however, was one of the largest disasters the Superior community has ever seen.

53.     The Evacuation Order forced people living and working in the Evacuation Zone, spanning more than 70 square miles, to flee.

54.     Six injured refinery workers were taken to hospitals and seven others were treated at the scene. Two were hospitalized overnight. Hospital officials said there were 16 patients, including some refinery workers and some residents, treated for evacuation-related injuries.

55.    Gridlock stalled traffic throughout the city of Superior. Fleeing residents who drove to Duluth, usually a 10-minute drive, were stuck in traffic for two hours, while police officers in gas masks walked up and down streets telling drivers, "You need to evacuate."

56.    Essentia Health facilities in Superior, including the entirety of St. Mary's Hospital, were forced to shut down and evacuate their patients to facilities in Duluth.

57.    Three schools in the Evacuation Zone—Great Lakes Elementary, Superior Middle School, and Northern Lights Elementary—evacuated children and bused them to a parking lot, where they then waited for anxious parents to pick them up.

58.    The Superior school district also cancelled school the day after the explosion. Although the evacuation order was lifted Friday morning, there was no time for all the teachers, staff, and students to return to Superior. Because of state requirements, schools had to make up the lost time, and thus were forced to add time to each day through the end of the school year. The school district's financial losses alone reached nearly $300,000, due to lost lunch revenue, additional staff compensation, and replacement air filters for school buildings.

59.    Concerns about pollution from the Husky Superior Refinery explosion continue to worry Superior residents.

60.    Toxic chemical compounds called polycyclic aromatic hydrocarbons fell out of the plume and contaminated soils for miles southeast of the refinery. Despite assurances from Defendants that there is no pollution threat from the Husky Superior Refinery explosion, a University of Minnesota professor has warned residents not to plant vegetable gardens in backyards near the refinery or under the plume of smoke from the explosion.

61.     The Environmental Protection Agency is trying to recover the firefighting foam and any residual chemicals in the water. U.S. Coast Guard and contractors used booms to prevent any petroleum or other contaminants from flowing out into the waters of Lake Superior.

62.     Some residents want to move out of the city altogether while others do not know what to believe about safety. A University of Wisconsin sociology professor observed, "It seems clear to me … that people have experienced some trauma around the explosion."

63.     Defendants have reimbursed certain residents for expenses related to the Husky Superior Refinery explosion, such as accommodation, food, and transportation costs. Defendants have not been requiring individuals to sign releases of liability, except for claims involving personal injury. Despite Defendants accepting certain claims for reimbursement, however, many more residents remain who have suffered damages as a result of the Husky Superior Refinery explosion and have yet to be reimbursed for losses incurred. Defendants have also not accepted some claims for reimbursement, and have failed to compensate individuals for **all** damages suffered.

64.     By its very nature, Defendants' claim reimbursement process has skewed towards reimbursing only certain segments of the affected population. Reimbursement of hotel accommodation only assists those who were privileged enough to have immediate access to the funds or credit necessary to pay for hotel costs upfront, without advance warning to budget for such costly expenses. Less fortunate affectees were forced to seek shelter wherever their means could afford, weathering the night in public parks or in their cars, without remuneration by Defendants.

## PLAINTIFFS' FACTUAL ALLEGATIONS

65.    As a result of the Husky Superior Refinery explosion, and at all times during and after the Evacuation Order, Plaintiffs suffered damages including, but not limited to, economic loss from evacuation-related expenses, lost wages, disruption and inconvenience, and interference with property rights.

66.    Plaintiff Jasen Bruzek was at work in Superior at the time of the explosion. Bruzek and all four members of his household and dog were forced to evacuate their home on April 26, 2018, due to the Husky Superior Refinery explosion and resulting Evacuation Order. Although Bruzek was able to secure overnight accommodation free of charge, he was forced to buy food and supplies and incur unnecessary transportation costs. The next day, due to school cancellations, Bruzek's wife was forced to take time off work to provide childcare for his children who could not attend school. Bruzek also suffered lost wages.

67.    Plaintiff Hope Koplin was at her home in Superior at the time of the explosion. Koplin and her family—including her mother who was in hospice care—were forced to evacuate their home on April 26, 2018, due to the Husky Superior Refinery explosion and resulting Evacuation Order. Although Koplin was able to secure overnight accommodation free of charge, she was forced to buy food and supplies and incur unnecessary transportation costs. Koplin also suffered lost wages.

68.    Koplin's mother passed away on May 3, 2018, just days after the explosion. She spent her final days being forced to evacuate from her home. Prior to the evacuation, Koplin's mother was eating and visiting with family members. Hospice care told Koplin that her mother was not "actively dying." Koplin's mother, however, was forced to evacuate to a hospital— against her wish to remain home for her care. When she was evacuated, she became stressed,

mistakenly believing she was dying or being put into a nursing home. That night, she told Koplin she was scared. The following day, the hospital called Koplin to tell her that, if her mother's wish was to die at home, she "better come get her." As such, Koplin's mother was taken back home by ambulance that day. Even though she was eating and talking prior to the evacuation, upon her return home, she was no longer eating or talking and her health quickly deteriorated. A few days later, Koplin's mother passed away.

69.      Plaintiff Neil Miller was at his home in Superior at the time of the explosion. Miller and his family were forced to evacuate their home on April 26, 2018, due to the Husky Superior Refinery explosion and resulting Evacuation Order. With no funds on hand for a hotel room, Miller and his family were forced to spend the night in Canal Park in Duluth. Miller tried to return to his home at 3:00 AM, only to be turned away. Miller was forced to buy food and supplies and incur unnecessary transportation costs. Upon returning to his home, it was covered in ash. Although Defendants represented they would wash and clean Miller's house and gutters, they have done nothing to date.

## CLASS ACTION ALLEGATIONS

70.      Plaintiffs bring this action on their own behalf and pursuant to the Federal Rules of Civil Procedure Rule 23(a), (b)(3), and (c)(4). Plaintiffs seek certification of a class ("Class") initially defined as follows:

> **All persons and entities who/which on April 28, 2018 were residents of, present in, employed in, or maintained a place of business in the Evacuation Zone who sustained unreimbursed economic loss or loss of enjoyment/use of their property, excluding personal injury damages.**

71.     Excluded from the above Class are Defendants, including any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representative, heirs, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families.

72.     Collectively, members of the Class are referred to as "Class Members."

73.     Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

74.     **Numerosity.** Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous that the joinder of all members is impractical. According to public information available from the city of Superior, the city's population is estimated to be approximately 27,224. While the exact number of Class Members is unknown to Plaintiffs at this time, Plaintiffs believe that the Class includes thousands of members. The disposition of the claims of Class Members in a single action will provide substantial benefits to all parties and to the Court.

75.     **Commonality.** Fed R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.     Whether Defendants breached their duty to exercise the utmost care and diligence in the ownership, operation, management, supervision, inspection, maintenance, repair, and/or control of the Husky Superior Refinery, so as to not cause harm to public property, the environment, public resources, public health, and/or the comfortable use and enjoyment of life and liberty by the public.

16

b.      Whether Defendants' breach was the legal and proximate cause of Plaintiffs' damages.

c.      Whether Defendants' acts or omissions as set forth herein have interfered with Plaintiffs' property rights, privileges, and use and enjoyment of property so as to constitute a nuisance.

d.      Whether Defendants were engaged in an extrahazardous and/or ultrahazardous activity and/or intentionally, recklessly, and/or negligently caused an array of toxic substances, noise, soot, ash, and/or dust to enter Plaintiffs' property.

e.      Whether Defendants' activities in operating, controlling, managing, and/or maintaining the Husky Superior Refinery constitute an extrahazardous and/or ultrahazardous and abnormally dangerous activity.

76.     **Typicality.** Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because Plaintiffs and Class Members all suffered damages resulting from the Evacuation Order that was issued as a direct result of the Husky Superior Refinery explosion.

77.     **Adequacy of Representation.** Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in litigation of class actions, including actions relating to chemical incidents, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs' claims are typical of the claims of other members of the Class and Plaintiffs have the same non-conflicting interests as the other Members of the Class. The interest of the Class will be fairly and adequately represented by Plaintiffs and their counsel.

78.     **Superiority of Class Action.** Fed R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of

17

all the members of the Class is impracticable, and questions of law and fact common to the class predominate over any questions affecting only individual members of the class. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

79.    Damages for any individual class member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go un-remedied.

## CAUSES OF ACTION

### Count I
### (Negligence)

80.    Plaintiffs incorporate the substantive allegations contained in each and every paragraph of this Complaint.

81.    Plaintiffs are informed and believe, and thereon allege, that at the time of the subject incident, Defendants owned, operated, controlled, managed, and/or maintained the Husky Superior Refinery, as described above.

82.    At all relevant times, Defendants were required to exercise the utmost care and diligence in the ownership, operation, management, supervision, inspection, maintenance, repair, and/or control of the Husky Superior Refinery, so as not to cause harm to public property, the environment, public resources, public health, and/or the comfortable use and enjoyment of life and liberty by the public.

83.    Defendants failed to exercise due care in the maintenance and monitoring of the Husky Superior Refinery so as to prevent fires, explosions, and the uncontrolled release of hazardous substances, odors, and wastes into the environment.

84.     As a direct and proximate result of Defendants' breach of their duties, Plaintiffs and those similarly situated were harmed. Defendants' breach of their duties was the direct and proximate cause of the Husky Superior Refinery explosion that caused the release of hazardous substances, odors, and wastes, and the interference with property rights of Plaintiffs.

85.     As further direct and legal result of Defendants' breach of their duties, Plaintiffs have suffered damages, including but not limited to, economic loss from evacuation-related expenses, lost wages, disruption and inconvenience, and interference with property rights.

86.     Plaintiffs did not consent to Defendants' conduct, which required the public to evacuate for approximately 18 hours to avoid immediate harm and has created long-lasting and continuing harm.

87.     In addition to the negligence stated above, and in the alternative, the injuries and damages suffered by Plaintiffs and others were caused by acts or omissions of Defendants, which acts or omissions may be beyond proof by Plaintiffs herein, but which were within the knowledge and control of Defendants such that there are no other possible conclusions than that the Husky Superior Refinery explosion resulted from the negligence of Defendants. Furthermore, the Husky Superior Refinery explosion would not have occurred had the Defendants exercised the high degree of care imposed on them and Plaintiffs therefore plead the doctrine of *res ipsa loquitur.*

**Count II**
**(Nuisance)**

88.     Plaintiffs incorporate the substantive allegations contained in each and every paragraph of this Complaint.

89.     Defendants' acts or omissions as set forth herein have interfered with Plaintiffs' property rights, privileges, and use and enjoyment of property so as to constitute a nuisance.

90.     Plaintiffs' interests in the use and enjoyment of their property was diminished by Defendants' acts or omissions, which caused, among other things: the evacuation of Plaintiffs and all others from the Evacuation Zone, and the release of hazardous and other substances into the air and onto Plaintiffs' property.

91.     Plaintiffs did not consent to Defendants' actions as described herein.

92.     Defendants' acts and omissions as alleged herein constitute an unreasonable interference with the safety, peace, comfort, and convenience of the Plaintiffs and all others similarly situated.

93.     Defendants' act and omissions have caused harm to Plaintiffs.

## Count III
### (Trespass on Land)

94.     Plaintiffs incorporate the substantive allegations contained in each and every paragraph of this Complaint.

95.     Defendants were engaged in an extrahazardous and/or ultrahazardous activity and/or intentionally, recklessly, and/or negligently caused an array of toxic substances, noise, soot, ash, and/or dust to enter Plaintiffs' properties.

96.     Plaintiffs did not give permission for this direct and/or indirect entry.

97.     Plaintiffs, along with numerous others in the Evacuation Zone, have been harmed by Defendants' conduct, as Plaintiffs have suffered the loss of the use and enjoyment of their properties, in the form of lingering malicious odor, noise, soot, ash, and dust in the air.

98.     An ordinary person of reasonable sensibilities would reasonably be annoyed and/or disturbed by the conditions created by Defendants.

99.     As a direct and legal cause of the wrongful acts set forth herein, Plaintiffs suffered damages as described in the preceding paragraphs.

**Count IV**
**(Strict Liability – Extrahazardous and/or Ultrahazardous Activity)**

100.    Plaintiffs incorporate the substantive allegations contained in each and every paragraph of this Complaint.

101.    At all times relevant herein, Defendants' activities in operating, controlling, managing, and/or maintaining the Husky Superior Refinery constitute an extrahazardous and/or ultrahazardous and abnormally dangerous activity, as the operation and maintenance of a refinery using hydrogen fluoride in a populated area poses serious risk of harm, regardless of the amount of care exercised.

102.    As alleged herein, Plaintiffs were seriously harmed, as a direct result of Defendants' extrahazardous and/or ultrahazardous and abnormally dangers activities in operating and maintaining the Husky Superior Refinery.

103.    Plaintiffs' harm, as outlined above, was the kind of harm that would be anticipated as a result of the risk created by Defendants' extrashazardous and/or ultrahazardous and abnormally dangerous activities, specifically the operation and maintenance of a refinery with hydrogen fluoride in a populated area.

104.    Defendants' extrahazardous and/or ultrahazardous and abnormally dangerous activities resulted in an explosion that emitted debris, ash, toxins, smoke, and other dangerous chemicals into the air, and was the direct cause of the evacuation that deprived Plaintiffs of the enjoyment and use of their homes and their ability to operate businesses and work.

105.    As a direct and legal cause of the wrongful acts herein set forth, Plaintiffs suffered damages as described above in the preceding paragraphs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

1.      For an Order certifying the Class, and appointing Plaintiffs and their Counsel to represent the Class;

2.      Awarding Plaintiffs actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

3.      Awarding Plaintiffs pre-judgment and post-judgment interest;

4.      Awarding Plaintiffs such costs and disbursements as are incurred in prosecuting this action, including reasonable attorneys' fees, as allowable by law; and

5.      Granting Plaintiffs such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Based on the foregoing, Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a jury trial for all claims so triable.

Dated: August 20, 2018                    By:  *s/ Patricia A. Bloodgood*
                                          **ZIMMERMAN REED LLP**
                                          Patricia A. Bloodgood (WI Bar No. 1003511)
                                          J. Gordon Rudd (MN Bar No. 222082)
                                          June P. Hoidal (*pro hac vice pending*)
                                          Daniel T. Lindquist (*pro hac vice pending*)
                                          1100 IDS Center
                                          80 South 8th Street
                                          Minneapolis, MN 55402
                                          T: 612-341-0400
                                          F: 612-341-0844
                                          Patricia.Bloodgood@zimmreed.com
                                          Gordon.Rudd@zimmreed.com

June.Hoidal@zimmreed.com
Daniel.Lindquist@zimmreed.com