IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JASEN BRUZEK, HOPE KOPLIN,
and CHRISTOPHER PETERSON,
individually and on behalf of all
others similarly situated,

                    Plaintiffs,

     v.

HUSKY OIL OPERATIONS LIMITED
and SUPERIOR REFINING
COMPANY LLC,

                   Defendants.

OPINION AND ORDER

18-cv-697-wmc

On the morning of April 26, 2018, an explosion occurred at a refinery in Superior, Wisconsin, and the resulting fire advanced within 150 to 200 feet of a tank of hydrogen fluoride ("HF"). As a precaution against the potential release of HF into the air, which can travel and cause injury to those who inhale it, a mandatory evacuation order was issued to the community surrounding the refinery. The named plaintiffs are residents of Superior who were forced to evacuate as a result of the explosion and seek to bring this action on behalf of themselves and two putative classes against defendants Husky Oil Operations Limited ("Husky Oil") and Superior Refining Company, LLC ("SRC") as owner of the subject refinery ("Superior Refinery" or "Refinery").

Now before the court are a number of related motions. First, defendants move for partial summary judgment, arguing that plaintiffs' claims seeking injunctive relief as to the continued use of HF at the Superior Refinery must be dismissed. (Dkt. #137.) Second, plaintiffs seek to certify two classes. (Dkt. #108.) Third, defendants move to exclude the

expert testimony of Dr. Charles L. Baum II. [1]  (Dkt. #134.)  Dr. Baum opines as to an hourly compensation rate for economic losses for annoyance, inconvenience, and discomfort for the typical resident subject to the evacuation order.  He also testifies that a per diem rate is appropriate to compensate evacuated residents for expenses incurred. Defendants argue that this testimony is neither reliable nor helpful to a fact-finder, and thus should be ruled inadmissible.  Finally are motions from both parties seeking to seal and unseal various documents.  (Dkts. #121, 133.)

As explained in the discussion that follows, the court will grant defendants' motion for partial summary judgment because plaintiffs have failed to proffer adequate facts to show that defendants' use and storage of HF poses an ongoing or imminent threat of injury, as is required to establish standing for injunctive relief.  This conclusion necessarily requires the court to deny certification of plaintiffs' Rule 23(b)(2) class, the stated purpose of which is to seek declaratory and injunctive relief requiring HF-related safety improvements. However, the court will certify the remaining proposed Rule 23(b)(3) class for the purposes of determining the defendants' alleged liability, while reserving for individual hearings issues of causation and damages since the distinct factual issues would appear to predominate over common ones.  As for defendants' motion to exclude the expert testimony of Dr. Baum, plaintiffs' motion to unseal certain documents, and defendants'

---

[1] Defendants also previously moved to exclude the expert testimony of John A. Kilpatrick.  (Dkt. #130.)  In response, plaintiffs withdrew the report of Dr. Kilpatrick "[t]o avoid any inference of seeking duplicative damages."  (Dkt. #151.)  Accordingly, the court will deny this motion as moot.

motion for leave to file certain documents and exhibits under seal, the court will reserve on each at this time.

## I. Defendants' Motion for Partial Summary Judgment

### A. The Explosion, Fire, and Evacuation

Husky Energy, Inc. is an integrated parent company that owns various subsidiaries and portfolio companies, including defendants Husky Oil and SRC.  In turn, SRC is the current owner of the Refinery, having purchased it on November 8, 2017, just five months before the explosion and fire at issue in this case.  The Refinery was originally built in 1950 and had been in operation for over sixty years.

On April 26, 2018, the Refinery began shutting down a fluid catalytic cracking unit ("FCCU") as a part of a routine, five-year maintenance cycle.  At 10 a.m., two explosions occurred downstream of the FCCU, which caused a metal fragment to puncture a hole in an asphalt tank, releasing asphalt.  At approximately noon, the asphalt ignited, which caused a large fire that was not extinguished until around 7 p.m.

As previously noted, hydrogen fluoride or HF is stored and used at the Refinery, and if released into the air, it has the potential to travel and pose a risk to those in its path.  Specifically, inhalation of HF can cause severe respiratory irritation, immediate injury to the lining of the lungs, and/or death.  As a result, facilities handling HF must submit a risk management plan ("RMP") to the U.S. Environmental Protection Agency, which includes the toxic extent of the "worst case" scenario for HF.[2]  According to the Refinery's RMP,

---

[2] The "worst case" scenario is based on maximum offsite impact without taking into account passive or active mitigation that can reduce the amount of HF released into the air.

the "worst case" scenario for the release of the HF stored at the Refinery could "affect" up to 180,000 people within a 22-mile radius.

While the fire got within 150-200 feet of the tank, no HF was released. Still, as a precaution, the Douglas County Emergency Management System issued a mandatory community evacuation order. The evacuation zone was determined based upon the potential risk of a release of HF.

### B. Disputed Facts Related to HF

The parties dispute whether the release of HF was ever actually "threatened." (*See* Defs.' Resp. to Pls.' PFOFs (dkt. #203) ¶ 1.) In particular, defendants point out that: (1) the fire never came within 150 feet of the HF tank; (2) there were numerous safety system in place to prevent any release of HF; and (3) the evacuation order was issued only out of an abundance of caution. Defendants further note that the United States Chemical Safety and Hazard Investigation Board ("CSB") did not identify the release of HF as a "near miss," nor did any other governmental agency.

A "near miss" incident is described by the International Association of Oil and Gas Producers in the following way:

> Near misses include those events with consequences that do not meet the company's criteria for recordable incidents such as a spill of less than one barrel. Near misses also provide simple observations of an unsafe condition with no consequences. These are recognised [sic] as events which had the potential – in other slightly different circumstances – to result in consequences that would have been recordable, particularly 'high potential events' where a major incident would have been a realistic worst case scenario. Therefore, near miss events provide leading information on the likelihood of actual incidents and also provide lagging information on barrier weaknesses. Near miss investigations can contribute

significantly to continuous improvement of asset integrity and process safety, whether used to identify barrier weaknesses or as a warning of a potential catastrophe.

(Int'l Ass'n of Oil & Gas Producers' Recommended Practice on Key Performance Indicators (dkt. #183-1) 3.)[3]

Plaintiffs point out that their expert John A. Williams opines as an engineer in his expert report that "the explosion resulted from abnormally dangerous conditions which propagated into a near catastrophe with extreme endangerment to the workers and community." (Williams Rep. (dkt. #109-18) 11.) In addition, Bill Demchuck, who led defendants' investigation into the explosion, testified that: (1) the Husky Energy corporate incident management procedure -- which states that it is initiated in response to an "actual or near miss incident" -- guided his investigation; (2) the primary purpose of his investigation was to avoid future, catastrophic incidents; and (3) the explosion was the worst incident he had encountered in terms of destruction, injuries, property damage, and safety risks to the public.

Plaintiffs further note that HF had previously been released at the Refinery in the past, including:

- In April 2013, a liquid containing HF was spilled and created an HF cloud which two contractor employees were exposed to. They were transported to

---

[3] Defendants' object to plaintiffs' use of this report on the grounds that the evidence is inadmissible hearsay. (See Defs.' Resp. to Pls.' PFOFs (dkt. #203) ¶¶ 19.) However, the report was arguably adopted by defendants under Fed. R. Evid. 801(d)(2)(B). Even if hearsay, it appears excepted from exclusion as a business record maintained by defendant under Fed. R. Evidence 803(6) or, at least, appropriately relied upon by plaintiffs' expert and usable in cross-examination of defendant's employees, including Mr. Demchuck discussed in the text above. As such, the court will consider the report for purposes of the present motions without prejudice to defendants, who may reassert their objection at a later stage in the proceedings.

the ER and received treatment for their inhalation exposure.

- In November 2013, an employee was sprayed with HF acid vapors due to a leaking value.  The operator was wearing "class C alky gear" at the time and there is no evidence that he required any subsequent medical attention.

- In December 2014, an "alky unit operator" had a brief exposure to HF.  He apparently experienced throat irritation, but no subsequent medical care was required.

- In October of 2015, operators discovered a valve hole leaking from an HF storage tank.  No HF appears to have been released, however, as the tank had been pumped out previously and was under nitrogen pressure at the time of the leak.

- In November of 2015, the Refinery restricted employees' access and blocked the roads near the HF alkylation unit due to a release of HF vapors from the acid storage tank.

Understandably enough, the named plaintiffs in this case have also testified as to

their personal fears regarding defendants' continued use of HF at the Refinery as follows:

- Mr. Peterson would like the Refinery "not to use hydrogen fluoride in my town where my family lives.  I'd like them to switch over to the ionic liquids that are a lot safer." (Pls.' PFOFs (dkt. #203) ¶ 49.)

- Mr. Bruzek expressed his hope that "hopefully they can get rid of that tank." (*Id.* ¶ 50.)  He continued:  "I want my kids to be safe.  I want my family to be safe.  I want our community to be safe.  That's all I want . . is the future to be better.  Because we shouldn't have to live in fear of this ever again."  (*Id.* ¶ 51.)

- Ms. Koplin feels that defendants "didn't have proper safety precautions in line, and that maybe they shouldn't have had their tankers so lose together.  Because it's my understanding that if the other one would have blew, Superior would no longer be."  (*Id.* ¶ 52.)

A 2019 focus group report further concluded that it "was very clear in the discussions about

the incident . . . that the question of hydrogen fluoride was at the heart of public anxiety

about the refinery." (Pls.' Exhibits, Ex. LL (dkt. #109-31) 5.)[4]  The report continued: "The fact that [HF] was not released didn't really make [the focus group participants] feel better about the refinery -- meanwhile learning about the existence of the chemical made them somewhat more fearful of the refinery and potential future incidents." (*Id.*)

As for alternatives to HF, Dr. Williams opines that ionic liquid alkylation and solid catalyst alkylation are currently feasible replacements for the HF alkylate production capacity at the Refinery.  In contrast, defendants' expert opines that "Williams is wrong that either or both ionic liquid and/or solid catalyst alkylation alternatives were feasible in April 2018 or are even truly feasible now as proven, safe, reliable process alternatives for refineries." (Mastracci Rep. (dkt. #141-1) 22.)

## C. The Consent Decrees and Proposed Upgrades to the HF unit

The Refinery had previously been owned by Murphy Oil USA, Inc.  In 2011, Murphy Oil entered into a Consent Decree for alleged environmental violations at the Superior Refinery and at another refinery owned by Murphy Oil in Louisiana, which was approved by this court.  *See United States v. Murphy Oil USA, Inc.*, No. 10-cv-563-bbc (W.D.

---

[4] Defendants' object to plaintiffs' use of this report on the grounds that the evidence is inadmissible hearsay. (*See* Defs.' Resp. to Pls.' PFOFs (dkt. #203) ¶¶ 53-57.)  However, if prepared for use by defendants as part of conducting business, the report may fall under the business records exception. *See* Fed. Rule Evidence 803(6).  Moreover, at least as to damages, the report may be something that an expert could rely upon.  Accordingly, the court will not exclude the report's contents in considering the pending motions, although the court will not preclude defendants from reasserting their objection at a later stage in the proceedings.

Wis. Feb. 16, 2011).[5]  Various amendments have been proposed and approved since that decree was first entered.

In May of 2018, SRC provided the United States and the State of Wisconsin with an initial notice of its claim that the April 2018 explosion and fire constituted a *force majeure* event, adversely affecting its performance of obligations under the Consent Decree.  In particular, plaintiffs point out -- and defendants admit -- that the emissions released during that incident likely violated its provisions.  The United States, Wisconsin, and SRC then engaged in negotiations and ultimately agreed to file a Third Amendment to the Consent Decree to address the incident.  Among other things, the parties to the Third Amendment all expressly agreed to the continued operation of the Refinery using HF with enhanced safety measures, including (1) the installation of an automated, laser HF leak detection and alarm system and (2) the installation of video cameras to monitor the HF tank continuously.  The Third Amendment also requires that SRC install and maintain existing components for the isolation valves and point sensor leak detection system, as needed, to provide early detection of low-level releases of HF around the entire perimeter of the HF unit.  Finally, the Third Amendment requires SRC to conduct additional studies on other enhancements to the HF unit, including passive mitigation, power supply, and various program revisions, reports of which are to be provided to the EPA and the Wisconsin Department of Natural Resources ("WDNR").  Still, the defendants in suit concede that

---

[5] In addition to the United States of America, plaintiffs in that suit were the State of Wisconsin, and the Louisiana Department of Environmental Quality.

these upgrades will address some, but not all, of the safety enhancements proposed by plaintiffs' expert, Dr. Williams.

Nevertheless, after briefing and the required public comment period, this court approved the Third Amendment on May 27, 2020. *United States v. Superior Refining Co., LLC*, 10-cv-563-bbc (W.D. Wis. May 27, 2020). The court also retains jurisdiction and supervision of SRC's continuing obligations under the provisions of the original consent order and amendments, including the Third Amendment. If SRC fails to comply with those provisions -- including the HF-related safety enhancements in the Third Amendment -- the court may impose previously stipulated penalties, which are capped at $32,500 per day per individual violation.

### D. Grant of Partial Summary Judgment

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts and draw all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Here, defendants' partial motion for summary judgment is directed at plaintiffs' request for injunctive relief preventing, or at least modifying, the continued use of HF at the Superior Refinery. Generally, plaintiffs' amended complaint seeks "an injunction enjoining Defendants from maintaining or using hydrogen fluoride at the Husky

Superior Refinery." (Am. Compl. (dkt. #29) 27.)[6] Defendants now contend that plaintiffs' claim for such relief must be dismissed because: (1) they lack standing, (2) their claim is moot; and/or (3) their claim is preempted by the Third Amendment to the 2011 Consent Decree.

However interesting the other issues proposed may be, the court must begin and end with the question of plaintiffs' standing -- because they have failed to demonstrate a sufficient injury-in-fact, their claims of prospective relief as to defendants' use of HF must be dismissed.

To establish standing to sue, a plaintiff "must have suffered an 'injury in fact' -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations omitted). Moreover, these requirements must be proved "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. Thus, when standing is considered at summary judgment, a plaintiff "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Id.* In particular, "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S.

---

[6] Plaintiffs formulate their request somewhat differently in their motion for class certification, in which they seek "declaratory judgment that the Superior Refinery's storage of HF constitutes a public nuisance and injunctive relief requiring abatement of this public nuisance through enhanced safety measures." (Pls.' Br. Mot. for Class Cert. (dkt. #109) 43.)

488, 495-96).  Instead, to establish standing for prospective injunctive relief, a plaintiff must show either that there is a continuing, present injury or a real and immediate threat of future injury.  *Id.; see also* 1 Newberg on Class Actions § 2:7 (5th ed.) ("Any plaintiff seeking injunctive relief typically must demonstrate that she will be subjected to the defendant's policy again in the future.  This basic rule does not change for the class action plaintiff.").  In seeking an injunction against defendants' continued use and storage of HF, therefore, plaintiffs cannot rest on a showing that they have *previously* been harmed by defendants' unlawful conduct (e.g., they were evacuated due to the threat of HF resulting from defendants' negligence); they must show that there is either a continuing injury or a real and immediate threat of repeated injury.

As noted, plaintiffs' injury-in-fact must also be "concrete."  *Lujan*, 504 U.S. at 560.  Of course, "'[c]oncrete' is not . . . necessarily synonymous with 'tangible.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016).  *See also Larkin v. Fin. Sys. of Green Bay, Inc.*, 2020 WL 7332483, at *2 (7th Cir. Dec. 14, 2020) ("'[C]oncrete' does not necessarily mean 'tangible.'").  For example, in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000), the Supreme Court explained that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Id.* at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).  In *Laidlaw*, an environmental organization brought suit against the owner of a hazardous waste incinerator facility, claiming that it unlawfully discharged pollutants into a nearby river and seeking an injunction from further discharge.  *Id.* at 175-76.  In support,

11

the organization presented various affidavits and testimony from its members explaining, among other things, that they previously fished or waded in the river but no longer did so out of concern for the harmful pollutants.  *Id.* at 181-82.  The Court concluded that this evidence supported plaintiff's assertion that defendant's "discharges, and the affiant members' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests," and thus held that plaintiff had "adequately documented injury in fact." *Id.* at 183-84.

Plaintiffs in the present case assert that "[s]imilar to the plaintiffs in *Laidlaw . . .* they have very real fears and concerns living in the shadow of the Superior Refinery while Defendants continue to use HF." (Pls.' Opp'n Summ. J. (dkt. #182) 13.)  Without in any way diminishing plaintiffs' real fears and concerns, the injury claimed in *Laidlaw* is readily distinguishable from those here.  In *Laidlaw*, plaintiff's members testified that their fears and concerns were manifested by concrete injury that they no longer fished or waded in the river.  By contrast, plaintiffs here aver simply that they are afraid or concerned without translating those feelings into similar, concrete actions against their interests.  Moreover, the Supreme Court has previously explained that "[t]he emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *City of Los Angeles*, 461 U.S. at 107 n.8.  Most recently, the Seventh Circuit also held in the context of a claim under the Fair Debt Collection Practices Act that a plaintiff's "state of confusion is not itself an injury," although "[a] debtor confused by a dunning letter may be injured if she acts, to her detriment, on that confusion -- if, for example, the confusion leads her to pay something she does not owe, or

to pay a debt with interest running at a low rate when the money could have been used to pay a debt with interest running at a higher rate." *Brunett v. Convergent Outsourcing, Inc.*, 2020 WL 7350277, at *2 (7th Cir. Dec. 15, 2020). Thus, plaintiffs' fear of defendants' use of HF, without more, is not a sufficiently concrete injury to establish standing for injunctive relief.

Understandably enough, in response to defendants' standing challenge, plaintiffs emphasize that the *threat* "of future harm resulting from Defendants' continued use and storage of HF" is sufficient to establish standing. (Pls.' Opp'n Summ. J. (dkt. #182) 16.) At some point involving the actual release of HF into the community, or perhaps even another evacuation order due to an imminent threat of release may amount to a sufficiently concrete injury to pursue injunctive relief. *See Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982) (a "threatened" injury can sometimes be sufficient to establish standing); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) ("[O]ne does not have to await the consummation of threatened injury to obtain preventive relief.") (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)). At the same time, a "conjectural" or "hypothetical" injury is insufficient. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). As a result, the "question becomes whether any perceived threat to respondents is sufficiently real and immediate to show an existing controversy." *Blum*, 457 U.S. at 1000 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).

Here, the Refinery has been operating for over sixty years without a release of HF into the community, including during the April 2018 incident. While individuals have previously been injured by HF-related accidents *at the Refinery*, they were all employees or

contractors, and thus these injuries are of limited relevance to plaintiffs' argument that HF poses a threat to the broader community. Far more persuasive is the evidence presented by plaintiffs that the April 2018 was a "near miss" event, which could have resulted in severe endangerment to the community. Indeed, the presence of HF at the Refinery and its threatened release was the very reason for the evacuation order. However, plaintiffs have produced no specific evidence as to the likelihood of a reoccurrence of such an incident, or concrete actions taken in response to that threat, and "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy" in cases seeking injunctive relief. *Lyons*, 461 U.S. at 95.

Even the relevance of the April 2018 incident is limited due to the fact that defendants have since agreed to specific safety upgrades related to HF, especially when these safety upgrades -- along with defendants' continued storage and use of HF -- were signed off by the United States, the State of Wisconsin, and this court in the Third Amendment to the 2011 consent decree. Admittedly, the Third Amendment does not contain *all* the safety enhancements suggested by plaintiffs' expert, Dr. Williams, and he has further opined that alternatives to HF exist and are feasible, but neither of these facts, even taken as true, necessarily imply that defendants' continued use of HF poses an imminent threat to the community.

On this record at least, the court concludes that plaintiffs have not produced enough evidence for a reasonable factfinder to conclude that defendants' continued use of HF presents more than a speculative threat of injury. Accordingly, their claims regarding prospective relief against defendants' continued use of HF can proceed no further. This

14

ruling necessarily includes denial of plaintiffs' motion to certify a Rule 23(b)(2) class, the stated purpose of which was to request "declaratory and injunctive relief requiring Defendants to make specific safety improvements to support the safer storage of HF." (Pls.' Br. Class Cert. (dkt. #109) 42.)

## II. Plaintiffs' Motion for Class Certification

### A. Additional Facts Related to the Explosion, Evacuation and Fire[7]

When defendants acquired the Refinery in November of 2017, they were aware that many of the buildings and process structures dated back to the 1960s.  For example, the HF alkylation unit dated back to 1961 with no updates since it was built; and the FCCU was also built in the early 1960s with its last major renovation in 1994.  Defendants also knew that the Refinery faced multiple, overdue inspections making it noncompliant with recommended practices published by the American Petroleum Institute.  Moreover, an April 6, 2018, risk report presented to defendants shortly after acquiring the Refinery identified numerous systems as outdated or inadequate.

A number of issues also surfaced in the lead-up to the planned April 2018 shutdown/turnaround:  (1) since the Refinery did not have an existing, formal Pre-Startup Safety Review ("PSSR") process, defendants had to create one, which would serve as a final check that safety processes, personnel, and equipment are properly implemented prior to

---

[7] In addition to the facts discussed above, the following facts are assumed for purposes of considering plaintiffs' motion for class certification.

startup; (2) the spent catalyst slide valve ("SCSV") -- the component that failed and caused the incident -- had experienced several "upsets" just days before the shutdown; (3) there were numerous FCCU and SCSV incidents rising to the level of WDNR notification events; and (4) the FCCU shut-down operating procedure was updated just *one day* before the shutdown.

On the morning of April 26, 2018, operators initiated steps to shut down the FCCU, including closing two slide valves connecting the reactor to the regenerator. But one of the slide valves -- the defective SCSV -- had eroded to the point where the valve could not maintain a protective barrier to the reactor. The failure of the SCSV allowed a flammable mixture of hydrocarbons and air to form. During the next several hours, the Refinery's alarm and instrumentation system failed to adequately alert FCCU operators to the leak.

At 10 a.m., the buildup of a mixture of hydrocarbons and air resulted in an explosion, which immediately sparked fires and punctured an asphalt tank. Moreover, because the Refinery had not properly identified the asphalt as flammable material, emergency personnel responding to the explosion failed to mitigate the danger of the asphalt igniting, and more than two hours after the initial explosion the asphalt ignited into a fire that burned until late in the evening. This burning asphalt further released dense clouds of noxious smoke and soot that spread for more than 30 miles downwind of the Refinery.

## B. Evacuation and Named Plaintiffs

As a precaution against the possible release of HF, a mandatory evacuation order was issued shortly before 1 p.m. The evacuation zone covered a one-mile radius around

the Refinery -- later increased to three miles -- and ten miles south and three miles east and west of the Refinery.  Thousands of people were evacuated from their homes and businesses until the order was lifted the next morning.

Jasen Bruzek and his family were ordered to evacuate from their home, which was located one and a half miles from the Refinery.  Mr. Bruzek evacuated with his dog and drove to Duluth to meet his wife, who had wisely left earlier with their two children.  The Bruzek family ate lunch at a Duluth restaurant, then eventually found a free motel room where they stayed the night.  Bruzek returned to Superior the following morning, and his family followed later that afternoon.

Hope Koplin was home with her elderly mother less than one mile from the Refinery at the time of the explosion.  Ms. Koplin provided fulltime, in-home care to her mother and was able to evacuate in the evening after an ambulance transported her mother to a Duluth area hospital.  Ms. Koplin returned to Superior the next morning.

Christopher Peterson felt the explosion while working from his home office.  He helped his girlfriend, her daughter, and her grandparents to evacuate, and in the process purchases food and incurred transportation costs for the group of five, who drove to Mr. Peterson's girlfriend's parents' home, where they stayed until 1 a.m.

### C. Subsequent Investigations and Reimbursement Program

After the incident, the CSB and U.S. Occupational Safety and Health Administration ("OSHA") opened investigations.  OSHA's investigation resulted in eight serious citations, as well as a fine of $83,150.  The CSB has yet to issue its final report. Defendants also conducted their own "root cause" investigation.

Soon after the incident, defendants also established a process whereby affected residents could claim reimbursement for certain expenses incurred as a result of the explosion, fire, and evacuation.  Each claimant had to meet in person with a claims adjuster to receive a reimbursement payment.   Helmut Streblow, Manager of Insurance for Corporate Risk Management at Husky Energy, testified that the categories of expenses that would be compensated by the program included "lost wages, additional living expenses, possible bodily injury, and some property damage reimbursement."  (Streblow Dep. (dkt. #109-25) 21.)  To be reimbursed "for additional living expenses incurred as a result of the evacuation, [residents] had to provide proof, namely, receipts," although if someone did not provide a receipt (because, for example, "they either paid in cash or they were staying on their sister's couch") then a payment of up to $50 was made without receipts.  (*Id.* at 24-25.)  Similarly, under the reimbursement program, compensation for "inconvenience caused by lost wages" further required production of a pay stub, and did not provide nonworking individuals inconvenience damages for the value of their lost time during the evacuation.  (*Id.* at 28-29.)

Streblow acknowledged that he did not "consider designing the reimbursement process program [to reimburse] evacuated residents for the loss of use and enjoyment of their homes during the evacuation" or "for annoyance, inconvenience and discomfort suffered as a result of the incident and the evacuation."  (*Id.* at 21.)  Still, defendants point to a handful of specific claims files from the reimbursement program that indicate the claimant received an "inconvenience" payment.  They also point to three files in which the claimant received more than $50 in compensation for expenses without receipts.

18

Defendants do not, however, produce evidence explaining what these "inconvenience" payments accounted for or reconcile Steblow's testimony regarding the requirements of the reimbursement program with respect to these seemingly isolated, individual claim files.[8]

## D. Plaintiffs' Expert Reports

Plaintiffs retained Dr. John Williams, Ph.D., a licensed professional engineer, to provide a report in this case.  Generally, Dr. Williams opines that the April 2018 explosion and fire was a near-catastrophe caused by defendants' failure to ensure safe and adequate operations.

Plaintiffs also retained Dr. Charles Baum, Ph.D., who is a professor of economics and finance at Middle Tennessee State University with degrees from Wake Forest University and the University of North Carolina.  Dr. Baum testifies as to a formula to value economic losses from nuisance, annoyance, inconvenience, and discomfort for the

---

[8] Over a month after briefing was completed for plaintiffs' motion for class certification, defendants moved for a hearing on the motion, representing that it was necessary to address "misstatements" contained in plaintiffs' reply regarding the reimbursement program.  (Defs.' Mot. for Hearing (dkt. #213) ¶ 1.)  Defendants note that they only produced a limited sample consisting of 10% of the individual paid claim files, from which plaintiffs improperly drew conclusions.  Accordingly, defendants requested a hearing to "set the record straight" as to the reimbursement program.  (*Id.* ¶ 4.)  The court will deny this request for two reasons.  First, all of the relevant arguments made by plaintiffs in their reply brief were already articulated in their opening brief, and thus defendants already had a fair opportunity to address these points.  Second, defendants refused to produce during discovery the very information they now seek to provide the court during the requested hearing.  Specifically, plaintiffs requested *all* reimbursement program documents (*see* Bloodgood Decl. (dkt. #218) ¶ 2), but apparently after negotiations, the parties agreed to exchange 300 randomly selected claim files (*see id.* ¶¶ 5-8; Bloodgood Decl, Ex. 1 (email from plaintiffs' attorney Gordon Rudd to defendants' attorney Colleen Kenney) (dkt. #218-1).).  Thus, evidence of additional claims files would appear to be inadmissible, at least for purposes of the pending motions. *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) ("The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless.").

typical resident subject to the mandatory evacuation order.  His formula has calculated an hourly compensation rate of $19.54 per hour in losses for those who evacuated, and $8.22 per hour in losses for those who sheltered in place.  Dr. Baum also opines that a per diem rate of $144 per day is reasonable to compensate a typical adult resident for the additional living expenses incurred by residents who evacuated.

### E.  Class Certification

Rule 23 of the Federal Rules of Civil Procedure sets forth the basic procedural requirements for class action lawsuits.  Fed. R. Civ. P. 23.  "To be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b)."  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).  As discussed above, plaintiffs' motion to certify a Rule 23(b)(2) class must be dismissed for lack of standing.  That leaves only plaintiffs' proposed Rule 23(b)(3) class, which includes:

> All persons over the age of 18 subject to the Evacuation Order declared on April 26, 2018 as a result of the Superior Refinery explosion and fire who seek compensation for economic loss or loss of use and enjoyment of their property, excluding personal injury damages.

(Pls.' Mot. Class Cert. (dkt. #108).)  The plaintiffs seek to certify this class as to their claims of negligence, nuisance, and strict liability for extrahazardous activity.

To certify a class, plaintiffs must meet the four threshold requirements of Rule 23(a) -- numerosity, typicality, commonality, and adequacy of representation.  Fed. R. Civ. P. 23(a).  They also must meet the Rule 23(b)(3) requirements of predominance and superiority.  Fed. R. Civ. P. 23(b)(3).  A district court has the discretion to revise a class

definition to correct deficiencies or problems with the proposed definition.  *See Messner*, 669 F.3d at 825 ("Defining a class so as to avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of an art than a science.  Either problem can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis.").  However, "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original).  For this reason, a trial court must engage in a "rigorous analysis" to ensure that the requisites of the Rule are satisfied.  *Id.*  As necessary to satisfy this standard, that analysis appears below.

### 1.  Numerosity

A class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Plaintiffs here have presented evidence that thousands of people were affected by the mandatory evacuation order resulting from defendants' allegedly wrongful acts.  Joinder of all of those individuals would be impractical, and so numerosity is readily satisfied.

### 2.  Commonality

The commonality requirement is met when there are "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To meet this requirement, the claims "must depend upon a common contention . . . capable of classwide resolution -- which

means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. The Seventh Circuit advises that "[w]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (citing cases). Not every question need be common, and "[i]t is routine in class actions to have a final phase in which individualized proof must be submitted." *Id.*

Here, plaintiffs allege that defendants' operation of the Refinery was negligent and/or extrahazardous, causing the April 2018 explosion and evacuation, and leading to common claims of economic loss and loss of enjoyment of their property during the evacuation. The allegedly wrongful act(s) at issue would appear to be largely, if not completely, the same across the proposed class, giving rise to the same kind of claims. Notably, defendants do not appear to dispute that commonality is satisfied, focusing instead on other class requirements. Because plaintiffs' claims depend on a common contention capable of classwide resolution, commonality is met.

### 3. Typicality

The third prerequisite of a class action is typicality, which requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (quoting H. Newberg, Class Actions § 1115(b) at 185

22

(1977)).  Thus, the typicality requirement is "closely related" to commonality.  *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).  Moreover, "[t]he typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members.  Thus, similarity of legal theory may control even in the face of differences of fact."  *De La Fuente*, 713 F.2d at 232.

Defendants contend that the named plaintiffs' claims are not typical because the impact of the evacuation on them varied in material ways, including differences in their respective evacuation length, inconvenience, lost wages, and expenses.  (Defs.' Br. (dkt. #141) 26-27.)  But these differences all relate to each plaintiffs' amount of loss or damages, which as discussed in greater depth below, the court finds will require individualized determinations.  More importantly, defendants have not persuasively argued that named plaintiffs are not typical of the putative class as a whole, at least with respect to questions of liability.  Nor do there appear to be any unique defenses applicable to named plaintiffs alone.  Accordingly, the element of typicality is satisfied.  *See Mejdreck v. Lockformer Co.*, 2002 WL 1838141, at *2-3 (N.D. Ill. Aug. 12, 2002) (in nuisance and negligence case, typicality was met where claims were all based on the fact of defendants' alleged misconduct -- pollution -- and rested on the same legal theories, even though differences existed in the degree, effect, and fact of the pollution on each plaintiffs' individual property).

### 4.  Adequacy

The final Rule 23(a) requirement is that the class representative "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Assessment of this

requirement involves three considerations:  (1) whether the chosen representative has "antagonistic or conflicting claims with other members of the class," (2) whether the chosen representative has "a sufficient interest in the outcome to ensure vigorous advocacy," and (3) whether counsel for the named plaintiff is "competent, experienced, qualified, and generally able to conduct the litigation vigorously." *Wanty v. Messerli & Kramer, P.A.*, No. 05-CV-0350, 2006 WL 2691076, at *1 (E.D. Wis. Sept. 19, 2006) (citing cases).

Here, the court has already determined that named plaintiffs have generally the same interest in the outcome of this litigation as the rest of the class, and they do not have any apparent adverse interests, positions or claims.  Plaintiffs' attorneys also appear to be experienced litigators in the areas of class action, including complex, multi-district litigation.  (*See* Pls.' Mot. to Cert. Class Ex. MM (Zimmerman Reed LLP Firm Resume) (dkt. #110-13).)  Since defendants do not argue otherwise, the court finds that the class representatives are capable of fairly and adequately representing the interests of the class.

### 5.  Predominance

The "predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (citing 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1777, p. 518-19 (2d ed. 1986)).  Predominance is not satisfied if "individual questions . . . overwhelm questions common to the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013).  "While similar to Rule 23(a)'s requirements for typicality and commonality, 'the predominance criterion is far

more demanding.'" *Messner*, 669 F.3d at 814 (quoting *Amchem Prods., Inc.*, 521 U.S. at 623-24).

Here, plaintiffs argue that courts "routinely certify" cases like this one, (Pls.' Br. (dkt. #109) 32), while defendants maintain that courts "routinely deny class certification in cases like this one." (Defs.' Opp'n (dkt. #141) 29 (capitalization omitted).) The case law unsurprisingly is more nuanced than either party cares to admit. In *Amchem Products*, the Supreme Court explained that "mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement." 521 U.S. at 625. By way of explanation, the Court noted that the Advisory Committee comments to Rule 23 stated that such cases were "ordinarily not appropriate" for certification, yet also observed that lower courts have been certifying such cases in increasing number. *Id.* The upshot being, as the Court noted, that caution must be exercised in certifying mass tort cases. *Id.*

Again unsurprisingly given this guidance, courts since *Amchem* have sometimes certified mass tort cases, and sometimes not, depending on the particular factual circumstances in a given case. *Compare Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910 (7th Cir. 2003) (certifying class to determine liability in case alleging that defendant leaked chemicals into plaintiffs' soil and groundwater); *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988) (residents who lived or owned property near defendant's landfill could maintain class action to determine liability for allegations of leaked chemicals and contamination of local water supply); *Widdis v. Marathon Petroleum Co., LP*, No. 13-CV-12925, 2014 WL 11444248, at *8 (E.D. Mich. Nov. 18, 2014) (certifying class to

address common issues of liability in case alleging negligence and nuisance for injuries from an explosion and subsequent evacuation order); *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 388 (D. Colo. 1993) (common questions of liability in case alleging negligence, strict liability, private nuisance, and outrageous conduct for the release of hazardous radioactive and nonradioactive materials could be tried as a class); *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1284 (N.D. Fla. 2017) (claims of negligence, nuisance, trespass, and strict liability by residents downstream from a collapsed dam could be litigated as a class to address common questions of liability); *with Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006) (affirming denial of class certification in case involving a fire at an Exxon Mobil oil refinery on grounds that individual issues of proximate causation and damages predominated over common issues and that class action was not superior to individual suits); *Ancar v. Murphy Oil, U.S.A., Inc.*, 2008 WL 2951794, at *1 (E.D. La. July 25, 2008) (denying certification of a class of individuals who "sustained property damage, physical, mental and emotional injuries, fright, inconvenience, and interruption of or intrusion into their personal and professional lives" as a consequence of a fire at an oil refinery); *Bradford v. Union Pac. R.R. Co.*, 2007 WL 2893650, at *1 (W.D. Ark. Sept. 28, 2007) (rejecting class certification in case of toxic spill and evacuation).

For obvious reasons, this court takes particular note of the Seventh Circuit's affirmance of class certification granted in *Mejdrech*. *Mejdreck v. Lockformer Co.*, No. 01 C 6107, 2002 WL 1838141 (N.D. Ill. Aug. 12, 2002), aff'd sub nom. *Mejdrech v. Met-Coil*

*Sys. Corp.*, 319 F.3d 910 (7th Cir. 2003).[9]  In that case, residents sued a nearby metal factory, alleging that the factory's release of chemicals contaminated their soil and groundwater.  *Id.* at *1-2.  As here, plaintiffs brought negligence and private nuisance claims, among other causes of action.  *Id.* at *1.  Also, as here, plaintiffs specifically did *not* seek recovery for personal injuries.  *Id.* at *4.  The district court certified the class as to the "core questions" of liability, but not as to damages.  *Id.* at *7.  In upholding the district court's decision, the Seventh Circuit found "the district judge's determination was reasonable, indeed right."  *Mejdrech*, 319 F.3d at 911.  In particular, the Seventh Circuit explained that:  "[i]f there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings."  *Id.*

As an initial matter, the court disagrees with plaintiffs that the damages determinations in this case are susceptible to common proof.  Although plaintiffs specifically do not seek certification for personal injury, the putative class would still be eligible for various compensatory damages including lost wages and expenses incurred (for example, the cost of food and lodging during the evacuation period).  Further, in nuisance cases, Wisconsin courts have adopted § 929 of the Restatement (Second) of Torts which provides that:

---

[9] The court notes that "Mejdrech" is the name of the case in the Seventh Circuit, *see Mejdrech,* 319 F.3d 910, while a different spelling of the name "Mejdreck," was used by the district court, *see Mejdreck,* 2002 WL 1838141.  As always, the court will defer to the Seventh Circuit on this.

> (1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for
> (a) the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred,
> (b) the loss of use of the land, and
> (c) discomfort and annoyance to him as an occupant.

*Gallagher v. Grant-Lafayette Elec. Co-op.*, 2001 WI App 276, ¶ 27, 249 Wis. 2d 115, 135, 637 N.W.2d 80, 89 (quoting Restatement (Second) Torts § 929).

While tort damages do not require a showing of property damage or personal injury to be recoverable, *Krueger v. Mitchell*, 112 Wis. 2d 88, 107, 332 N.W.2d 733 (1983), "damages must be proven with reasonable certainty." *Cutler Cranberry Co. v. Oakdale Elec. Co-op.*, 78 Wis. 2d 222, 233, 254 N.W.2d 234 (1977). "[T]here is no absolute requirement of mathematical precision, and the fact that the full extent of the damages is a matter of uncertainty by reason of the nature of the tort is not a ground for refusing damages." *Id.* Moreover, where "the extent of injury and the amount of damage are not capable of exact and accurate proof . . . all that can be required is that the evidence with such certainty as the nature of the particular case may permit lay a foundation which will enable the trier of fact to make a fair and reasonable estimate." *Id.* at 234. That said, "[w]here damages are susceptible of precise proof, or of estimation by those having knowledge, or are capable of proof with certainty, such proof must be adduced." *Lindevig v. Dairy Equip. Co., a Div. of DEC Int'l*, 150 Wis. 2d 731, 738, 442 N.W.2d 504 (Ct. App. 1989) (quoting *Maslow Cooperage Corp. v. Weeks Pickle Co.*, 270 Wis. 179, 191, 70 N.W.2d 577 (1955)).

Here, plaintiffs propose a per diem rate to compensate individuals for lodging, meals, and incidentals incurred during the evacuation, as well as an hourly rate formula to compensate for annoyance, inconvenience, and discomfort during the evacuation period. (Pls.' Br. (dkt. #109) 40-41.)[10]  Without deciding definitively, such estimates do not appear to conform to Wisconsin damages law, as they do not seem take into account readily available evidence regarding each putative class member's losses, including for example how long an individual evacuated (if they evacuated at all), wages lost, expenses incurred, and their personal discomfort and annoyance experienced because of the evacuation.[11]  Accordingly, proceeding without this available evidence would appear to be improper for an individual case and, therefore, not proper as part of a class action -- as a procedural device, a class action cannot "abridge, enlarge or modify any substantive right." Rules Enabling Act, 28 U.S.C. § 2072(b); 1 Newberg on Class Actions § 1:1 (5th ed.).

Plaintiffs cite to only two cases approving an hourly rate formula and per diem approach to determine damages for nuisance and trespass class actions, but both were decided under Iowa's state law standard for class certification, rather than the federal

---

[10] Plaintiffs also initially included a flat payment for each head of household to compensate for the temporary taking of the family residences.  (Pls.' Br. (dkt. #109) 40-41.)  However, this rate was based on the testimony of Dr. Kilpatrick, whose expert testimony plaintiffs have since withdrawn. (Dkt. #151.)

[11] As noted by plaintiffs, under Wisconsin law "whether a particular nuisance is actionable depends on whether the interference with the use and enjoyment of land is unreasonable and substantial." *Krueger v. Mitchell,* 112 Wis. 2d 88, 107, 332 N.W.2d 733 (1983).  Since this inquiry is "objective" -- that is based on "the general standards of normal persons in the community and not on the standards of the individuals who happen to be there at the time," *id.* (quoting Restatement (Second) Torts, § 821F) -- plaintiffs suggest that nuisance damages may be calculated based on a hypothetical "typical" person.  However, while a nuisance liability claim is based on an objective standard, that does not necessarily mean individual damages are likewise calculated using such a standard.

standard at issue here.  *Freeman v. Grain Processing Corp.*, 895 N.W.2d 105 (Iowa 2017); *Miller v. Rohling*, 720 N.W.2d 562 (Iowa 2006).  Moreover, the Iowa standard has been described as "more generous" than the federal standard, *Freeman*, 895 N.W.2d at 130 (Appel J., concurring), and so the court not only does not find these cases to be controlling, but of limited persuasive value.

Still, "[i]t is well established that, if a case requires determinations of individual issues of causation and damages, a court may 'bifurcate the case into a liability phase and a damages phase.'"  *McMahon v. LVNV Funding, LLC*, 807 F.3d 872, 876 (7th Cir. 2015) (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015)).  Since the court has already found that certain core questions of defendants' liability may be determined by common proof, and are not overwhelmed by individual damages questions, plaintiffs' liability class may proceed.

These common questions include:  whether defendants' operation of the Refinery amounted to an extrahazardous activity; whether defendants breached their duty of care to plaintiffs in the operation and maintenance of the Refinery; whether defendants' allegedly wrongful actions caused the evacuation order; and whether being subjected to the evacuation order amounted to an unreasonable and substantial interference with the use and enjoyment of land.[12]  *See Mejdrech*, 319 F.3d at 911 (explaining that "core questions" regarding "whether or not and to what extent [defendant] caused contamination of the

---

[12] These liability questions appear equally common with some of the separately-filed personal injury cases that have arisen out of the same explosion and fire, raising an issue as to whether consolidation, if not expansion of the class, might be appropriate, but that issue will await further input from the parties.

area in question" were not overwhelmed by individual questions of "[w]hether a particular class member suffered any legally compensable harm and if so in what dollar amount," which "the judge reserved for individual hearings if and when Met-Coil is determined to have contaminated the soil and water under the class members' homes in violation of federal or state law"); *Widdis*, 2014 WL 11444248, at *8 (concluding that common questions, such as "the cause of the explosion, its foreseeability, and precautions defendant could have taken to prevent the explosion," predominate over individualized questions, including "the varying lengths of evacuation, levels of inconvenience, and the nature of each individual's exposure to toxic material"); *Cook*, 151 F.R.D. at 388-89 (concluding the common questions "including whether the operation of Rocky Flats constitutes an ultrahazardous activity; whether defendants exercised reasonable care to prevent the release of hazardous radioactive and nonradioactive materials from Rocky Flats; what materials were released, in what quantities; what caused the releases; what precautions to avoid emissions were taken; whether the geographic dispersion of the releases in the surrounding environment was reasonably foreseeable; and whether defendants engaged in intentional, reckless, willful, or wanton conduct" predominated over individualized questions, including "the nature and use of the different parcels of property, . . . the time when each plaintiff lived in the area, the duration of each plaintiff's stay in the area and possible statute of limitations defenses").

### 6.  Superiority

Finally, Rule 23(b)(3) requires a showing that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed R. Civ. P.

23(b)(3).  This requirement is satisfied if "a class action would achieve economies of time, effort, and expense and promote . . . uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615.

While defendants contend that the present action is not a superior method of adjudication in light of the reimbursement program (Defs.' Opp'n (dkt. #141) 16), this argument has been largely foreclosed by the Seventh Circuit.  Specifically, *In re Aqua Dots Prod. Liability Litigation*, 654 F.3d 748 (7th Cir. 2011), emphasizes that the text of Rule 23 requires the class action to be a superior method of *adjudication*, and that a voluntary product recall and reimbursement campaign is "not a form of 'adjudication.'"  *Id.* at 751-52.  Here, as in *Aqua Dots*, the reimbursement campaign is not a form of adjudication, and so its availability cannot render the class action an inferior method of "adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Moreover, the reimbursement program was admittedly only designed by defendants to compensate "lost wages, additional living expenses, possible bodily injury, and some property damage reimbursement."  (Streblow Dep. (dkt. #109-25) 21.)  Further, Husky Energy's Manger of Insurance for Corporate Risk Management -- who designed the reimbursement program -- explained that receipts were generally needed to provide reimbursements, although a payment of up to $50 was made without receipts.  (*Id.* at 24-25.)  While defendants point to specific claim files indicating that individuals were compensated for "inconvenience," or even compensated over $50 without receipts, these claim files largely appear to be exceptions.  Nor even to the extent fairly representative of

defendants' policy towards compensating claimants, does it appear that the inconvenience payments are synonymous with compensation for discomfort, annoyance, and loss of use of enjoyment damages available in nuisance actions under Wisconsin law. Thus, it appears that the reimbursement program did not cover all of the damages requested by plaintiffs.

Overall, the court finds that a class action is a superior method of adjudicating issues of liability in this case. As discussed above, the principal liability questions will rely on the same proof, making it inefficient to try thousands of separate cases alleging the same misconduct using the same proof. *See Mejdreck*, 2002 WL 1838141, at *7 ("[T]he core questions, i.e. whether or not and to what extent Defendants caused contamination of the area in question, will rely on the same proof. Therefore, it would be wholly inefficient to try thousands of separate cases that would allege the same misconduct and provide the same proof of such."). Further, this case is not unmanageable -- the class members are generally known as they include all those subject to the evacuation order, which covered a defined geographic area, and involves only Wisconsin law. Accordingly, the final requirement for Rule 23(b)(3) class certification is met.[13]

---

[13] In fairness to defendants, the Seventh Circuit in *Aqua Dots* did ultimately affirm the district court's denial of class certification on other grounds. 654 F.3d at 752. Specifically, the court suggested that typicality was lacking because "[a] representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests," but that case also posed serious problems of manageability because plaintiffs' punitive damages request implicated multiple states' laws and individual notice "would be impossible" because the identity of the consumers was unknown. None of these concerns are present in this case. *Id.* Specifically, as noted above, the reimbursement program here does *not* fully protect the class members' interests, as it only offered partial reimbursement for their alleged claims here, and manageability would not be an issue because there is no dispute that only Wisconsin law controls *and* class members are easily identified.

### III. Motion to Exclude Expert Report

Finally, the court must address defendants' motion to exclude Dr. Baum's expert report.  In it, Baum opines as to a per diem rate for expenses and an hourly compensation rate for economic losses for annoyance, inconvenience, and discomfort for the typical resident subject to the evacuation order.  Defendants argue that this testimony is neither reliable nor helpful to a fact-finder, and thus should be ruled inadmissible.  Given the court's decision to bifurcate the case -- in which common issues of liability may be tried as a class, with damages left for individualized hearings -- the court need not address the parties' arguments in detail at this stage, although Dr. Baum's testimony would appear largely irrelevant.  *See* Fed. R. Evidence 702(a) (expert opinion admissible if, inter alia, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue").  To the extent defendants still deem otherwise, the issue is best addressed by a motion in limine in specific cases.

### IV. Motions to Seal and Unseal

The final motions before the court are plaintiffs' motion to unseal various documents (dkt. #121), as well as defendants' motion to seal certain documents (dkt. #133).  Federal Rule of Civil Procedure 26(c)(1) provides that a court may issue an order protecting a "trade secret or other confidential research, development, or commercial information" from public disclosure "for good cause."  Still, there is "no absolute privilege for trade secrets and similar confidential information."  *Fed. Open Market Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 362 (1979) (quoting 8 C. Wright & A. Miller, Federal Practice and Procedure § 2043, at 300 (1970)).  To establish "good cause" and protect

34

confidential business information under Rule 26(c), the company seeking confidentiality must show a "clearly defined and very serious injury" that will result from disclosure. *Forst v. SmithKline Beecham Corp.*, 602 F. Supp. 2d 960, 974 (E.D. Wis. 2009) (quoting *Andrew Corp. v. Rossi*, 180 F.R.D. 338, 341 (N.D. Ill. 1998)).

Plaintiffs' motion seeks to unseal the class certification brief and the exhibits accompanying the brief.  (*See* dkts. #122, 180.)  In their reply brief, plaintiffs ask in the alternative to unseal only the specific pages from the exhibits that were cited in plaintiffs' class certification brief.  (Dkt. #180 at 8-12.)  Should the court decide to take this alternative approach, defendants ask that they have the opportunity to offer suggested redactions from those specific pages.  (Dkt. #181-1 at 5.)  The court agrees that this compromise approach is likely to best balance the public's interest in "what goes on at all stages of a judicial proceeding" and the "property and privacy interests of litigants," *Citizens First Nat. Bank of Princeton*, 178 F.3d at 945, particularly because many of the exhibits at issue are lengthy and appear to contain confidential information on some pages, but not others, nor necessarily on the pages actually relied on by plaintiffs.  Thus, defendants may have until March 8, 2021, to respond to plaintiffs' request to unseal the specific portions of the exhibits identified.  At that time, the court will also take up defendants' motion for leave to file certain documents and exhibits under seal.  (Dkt. #133.)

In drafting their response, defendants are reminded that it is *their* burden to show good cause.  Fed. R. Civ. P. 26(c); *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 37 (1984); *In re Matter of Cont'l Ill. Secs. Litig.*, 732 F.2d 1302, 1310 (7th Cir. 1984).  Moreover, any motion to maintain the confidentiality of information that fails to "analyze in detail,

document by document, the propriety of secrecy, providing reasons and legal citations" may be denied outright. *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 548 (7th Cir. 2002). *See also Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (a litigant must do more than just identify a kind of information and demand secrecy).

## ORDER

IT IS ORDERED that:

1) Defendants' motion for partial summary judgment (dkt. #137) is GRANTED.

2) Plaintiffs' motion for class certification (dkt. #108) is GRANTED IN PART and DENIED IN PART.  The following Rule 23(b)(3) class is certified to determine common questions of liability:

> All persons over the age of 18 subject to the Evacuation Order declared on April 26, 2018 as a result of the Superior Refinery explosion and fire who seek compensation for economic loss or loss of use and enjoyment of their property, excluding personal injury damages.

If liability is established, separate hearings will be held to determine the damages of individual class members.

3) On or before March 2, 2021, the parties should submit a joint proposed form and method of notice, or if unable to agree, plaintiffs should submit their own proposed notice, with defendants to respond by March 9, 2021.

4) Defendants' motion to exclude the expert report of Dr. Charles L. Baum II (dkt. #134) is RESERVED.

5) Defendants' motion to exclude the expert report of Dr. John A. Kilpatrick is DENIED AS MOOT (dkt. #130) given plaintiffs' withdrawal of that report.

6) Defendants' motion for a hearing (dkt. #213) is DENIED.

7) Plaintiffs' motion to unseal certain documents (dkt. #121) and defendants' motion for leave to file certain documents and exhibits under seal (dkt. #133) are RESERVED.  Defendants' may have until March 8, 2021, to file an

additional response to plaintiffs' request to unseal specific portions of the exhibits cited.

8) Now-dismissed defendant Husky Energy Inc.'s motion for leave to file a reply instanter (dkt. #88) related to the previous motion for reconsideration is DENIED AS MOOT.

Entered this 19th day of February, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge